### UNIVERSAL ATLAS CEMENT CO. v. OSWALD et ux.

#### No. 2154.

Court of Civil Appeals of Texas. Waco.

Oct. 26, 1939.

Rehearing Denied Jan. 18, 1940.

Nat Harris, Mabel Grey Howell, and Margaret Harris Gordon, all of Waco, for appellant.

W. V. Dunnam and Frank Fitzpatrick, both of Waco, for appellees.

ALEXANDER, Justice.

This suit was brought by Joe Oswald and wife against the Universal Atlas Cement Company for damages. The plaintiffs alleged, in substance, that the defendant in blasting rock for use in its cement plant set off an unnecessarily large quantity of explosives and that the blast therefrom cracked the rock foundation under plaintiffs' adjoining farm in such manner as to cause two water wells thereon to go dry and the subterranean moisture under the soil to drain off in such manner as to render the land less productive. The jury, in answer to special issues, found in favor of the plaintiffs, and, based on such answers, the court entered judgment in their favor for the sum of $6,900. The defendant appealed.

. The evidence shows that the plaintiffs own a farm of 138 acres adjoining defendant's cement plant. The cement company uses rock from its quarry near its plant for making cement. The rock is quarried by blasting. It is the practice of the company to so blast the rock from its quarry as to leave a perpendicular face or wall approximately fifty feet high. Two rows of holes are used in blasting. The first row of holes consists of about six in number set back twelve feet from the edge of the perpendicular wall and twelve feet apart and are drilled to a depth of approximately fifty feet. The second row of holes of a similar number is set back twenty-four feet from the edge of the perpendicular wall and drilled the same depth. Three charges of dynamite are placed in each hole, one in the bottom, another in the middle, and another near the top of the hole. Appellant's superintendent testified that on the occasion in question, July 15, 1935, approximately 2,600 pounds of dynamite of 40% nitroglycerine was used in blasting; that approximately 250 pounds of this explosive was placed in each hole; that about 150 pounds was placed in the bottom of the hole, and the balance of the charge was distributed between the middle and top of the hole; that the dynamite was caused to explode by the use of an electric wire attached to a cordo fuse, about 1/20th of a second being required for the explosion of all of the shots; that the blast was sufficient to break down from eight to ten thousand tons of rock at a time, the rock being crushed into pieces from the size of a man's fist to that of a desk. The place where the blasting was being carried on was considerably lower than plaintiffs' farm. There were two large wells or cisterns on plaintiffs' farm that had been dug in the rock. One of them was near the barn and was about 30 feet deep and 17 feet across at the bottom. The other well situated nearer the residence was a smaller one. Oswald testified that these wells were about 900 feet from where the cement company was blasting, but a map introduced in evidence tended to show that they were about 1,200 feet from the defendant's quarry at the time of the incident in question. The formation under the farm and the adjoining rock quarry was solid limestone rock up to about seven or eight feet of the surface. Plaintiffs' wells were filled by rainwater percolating through the surface of the ground to the solid rock and from thence it seeped into the wells. There was evidence that these wells had been in use for a number of years and had never gone dry. They supplied a large quantity of water for household use and the watering of livestock. The plaintiff, Joe Oswald, and his son testified that on July 15, 1935, they were at the large well drawing water for a cow. At that time the well was approximately fifteen feet deep in water. They testified that they heard a loud blast that had been set off by the cement company; that the earth shook, the trees quivered and the water in the well rippled or shook; and on the next day they went to the well and found it empty. Neither of the wells has held water since that time. These and other witnesses testified that they later found small cracks in the rock wall of the large well. There was testimony by various experts that the practice

followed by the defendant was the usual and customarily approved method for the quarrying of rock under the existing circumstances. There was evidence, however, that although the company had been quarrying rock from this same quarry for four or five years it had not usually used as large a quantity of explosives as was used on this occasion. In fact, on only six previous occasions had it ever used as much explosives as was used on this particular occasion, and on these occasions the blasting was being done at places much farther away from plaintiffs' wells than it was on the occasion here involved. A witness for appellant testified on cross examination that after the explosion on the occasion in question, the rock wall in the quarry was cracked so that water used in drilling new holes would seep out onto the floor of the quarry. It had not done so on previous occasions. One of appellant's witnesses, who operated a cement plant at another place, testified that at the plant operated by him only one row of holes was used for blasting; that under such method less rock was kicked off at a time and the kick-back or earth tremor was in proportion to the load kicked off; that the one row method could be used in appellant's plant, but as the amount of rock that would be kicked off at a time would be less, the expense of quarrying would be increased. The plaintiffs introduced testimony to prove that their land has been drier and less productive since the blasting in question. Some of the witnesses testified that previously, during the rainy season, the water would percolate through to the hard rock and then seep out on the sides of the hill, but that since the heavy blasting had been carried on, there were no more seeps, the inference being that the water was allowed to escape through the deep cracks created in the rock by the blast. Experts testified that ordinarily on land such as plaintiffs the rainwater which percolated through the surface of the land to the hard rock would remain there for use in feeding plant life, but that if the rock foundation was cracked, the water would escape through the cracks and cause the subsoil to dry out quicker. The jury found that on the occasion in question the defendant negligently used an excessive quantity of dynamite in blasting in its quarry, and as a proximate result thereof, plaintiffs' wells were destroyed and the solid structure under the farm was cracked and the farm rendered less productive, to plaintiffs' dam-

age in the sum of $6,900. The jury further found that the defendant did not exercise ordinary care and did not adopt the usual and customary practice in its blasting operations.

Appellant's main contention is that the findings of the jury that the defendant used an excessive quantity of dynamite in its quarry and that it was negligent in so doing is contrary to and unsupported by the evidence. There is a conflict of authority as to whether one, who by blasting by powerful explosives produces severe concussions or vibrations in surrounding earth and air and so materially damages property belonging to others, is liable, irrespective of negligence on his part. All authorities hold that where there is an actual invasion of the premises of another by the throwing of dirt, stone or débris, proof of negligence is unnecessary to a recovery of damages. Others hold that in the absence of an actual physical invasion of the premises, no recovery can be had unless negligence is shown. 22 Amer.Jur. 180; 25 C.J. 192. There are some cases in Texas which seem to support this latter view. Comanche Duke Oil Co. v. Texas Pacific Coal & Oil Co., Tex. Com.App., 298 S.W. 554; City of Dallas v. Newberg, Tex.Civ.App., 116 S.W.2d 476. This theory seems to have some reasonable foundation in those cases where the damage or annoyance is caused solely by noise or concussion of the air, for in those cases there is in fact no physical invasion of the premises; but in cases like the one at bar, where the parties own adjoining property, and one of them intentionally sets off an explosion that rents the earth under the premises of his neighbor, there is an actual physical destruction of the property of the adjoining owner, and it would appear to be more reasonable to hold that the one who set off the blast should be liable for the damages caused thereby, regardless of negligence, in the same manner as he would if he should invade the premises by the throwing of stones. However, a decision of this question is not absolutely necessary in this case. Here, the jury found negligence and it only remains for us to determine whether there is evidence to support this finding. Negligence, like any other fact, need not be proved by direct evidence but may be inferred where the surrounding facts and circumstances in evidence are such as to reasonably justify the inference. Houston E. & W. T. Ry.

Co. v. Boone, 105 Tex. 188, 146 S.W. 533; English v. Miller, Tex.Civ.App., 43 S.W.2d 642; Shell Petroleum Corp. v. Magnolia Pipe Line Co., Tex.Civ.App., 85 S.W.2d 829, par. 6. It is a very well established rule that "where the particular thing causing the injury has been shown to be under the management [and control] of the defendant, or his servants, and the accident is such as in the ordinary course of things does not happen, if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation, that the accident arose from want of care." Washington v. Missouri K. & T. Ry. Co., 90 Tex. 314, 38 S.W. 764, 765. See also Texas & Pacific Coal Co. v. Kowsikowsiki, 103 Tex. 173, 125 S.W. 3; International-Great Northern Ry. Co. v. Lucas, 128 Tex. 480, 99 S.W.2d 297; Edwards v. Hawkins, Tex.Civ.App., 77 S.W. 2d 1098. In the case at bar the thing which caused the injury to plaintiffs' property was the setting off of the blast on defendant's premises. These blasting operations were exclusively under the management and control of the defendant. The evidence was sufficient to justify the jury's finding that the blast set off by the defendant cracked the rock under plaintiffs' farm and caused the wells to go dry. In fact, the correctness of these findings does not appear to be seriously challenged. The injury sustained by plaintiffs is one that ordinarily would not have occurred if proper care had been used. Whether the defendant used proper care depended on the surrounding circumstances. The evidence shows that the defendant was using a powerful explosive in large enough quantities to move a tremendous amount of stone. This necessarily called for precaution. It ought to have known that the kick-back on the adjoining rock and resulting earth tremor would be very great. It is true, there was testimony by experts that the method pursued by the defendant was the one customarily used in quarrying rock, but this has reference to the feasibility of the practice for the purpose of securing the most rock at the least expense and not the injurious effect to the adjoining land owners. There was evidence that in at least one other quarry smaller shots of dynamite were used. In fact, the defendant itself had not generally used as much dynamite as was used on the occasion in question. It is also true that the expense of quarrying rock is greater where smaller shots are used, but the defendant would not have the right to sacrifice its neighbors' property merely to reduce its own expense. It had a right to quarry its rock, but it was under obligation to use diligence to so conduct its operations as not to injure plaintiffs' property. As said by the Commission of Appeals in Comanche Duke Oil Co. v. Texas Pacific Coal & Oil Co., 298 S.W. 554, 562: "Manifestly, a jury would be authorized to find the means of successive 'shots' of smaller amounts (as contrasted with one large 'shot') to be a possible way of accomplishing the purpose in mind; i. e., of 'exploiting' a given 'formation.'" It has been said that negligence may be inferred from the mere fact that an explosion intentionally set off is attended with violence and unusual results. 25 C.J. 196; Rafferty v. Davis, 260 Pa. 563, 103 A. 951. Under the circumstances, we cannot say that the jury was not justified in inferring that the defendant was pursuing a course in negligent disregard of the plaintiffs' rights. This assignment is overruled.

Appellant's witness Hamilton testified as an expert on a former trial. He died prior to the second trial and his evidence, taken at the former hearing, was read to the jury on the last trial. On motion for new trial three jurors testified that they did not give any consideration to Hamilton's testimony because, according to their understanding of the court's charge, they were not allowed to consider anything that had occurred at the former trial. In our opinion, this did not require the granting of a new trial. While new trials should be granted because of the happening of improper overt acts in the jury room, jurors, after they have been discharged and allowed to go from under the supervision of the court, should not be allowed to return and impeach their verdict upon a mere showing that they misunderstood the charge or misconceived or failed to give due consideration to the testimony. Kindle v. Armstrong Packing Co., Tex.Civ. App., 103 S.W.2d 471; Kuykendall v. Johnson Funeral Parlor, Tex.Civ.App., 38 S.W. 2d 601; Wood v. Gulf C. & S. F. Ry. Co., 15 Tex.Civ.App. 322, 40 S.W. 24; Meyer v. Gillespie County, Tex.Civ.App., 109 S. W.2d 220, 221. This case comes within this latter class and the trial court properly refused to grant a new trial because of the alleged misconduct of the jury.

We have considered all other assignments of error and find no reversible error.

The judgment of the trial court is affirmed.